# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
                                    )
NATCHITOCHES PARISH HOSPITAL        )
SERVICE DISTRICT et al.,            )
                                    )
          Plaintiffs,               )
                                    )
          v.                        )  Civil Action No. 05-12024 PBS
                                    )
TYCO INTERNATIONAL, LTD., et al.    )
                                    )
          Defendant.                )
                                    )
```

## MEMORANDUM AND ORDER

August 29, 2008

Saris, U.S.D.J.

In this proposed nationwide class action, Plaintiffs allege that Defendant Tyco[1] has engaged in unlawful anticompetitive conduct to foreclose competition in the United States market for sharps containers.  Plaintiffs seek to certify a nationwide class of all direct purchasers that have purchased sharps containers from Tyco during the proposed class period of October 4, 2001 through the present.[2]

---

[1] Defendants are Tyco International, Ltd., Tyco International (U.S.), Inc., Tyco Healthcare Group, L.P. (now Covidien), and The Kendall Healthcare Products Company (collectively, "Tyco").

[2] Plaintiffs propose to certify a class comprising:
> All persons who purchased Sharps Containers in the United States directly from Tyco at any time during the period October 4, 2001 through the present (and continuing until the effects of Tyco's anticompetitive conduct alleged herein cease) (the "Class Period").  The Class

In a prior order, the Court found that Plaintiffs satisfied the requirements of Fed. R. Civ. P. 23(a).  However, the Court deferred ruling on whether Plaintiffs satisfied the predominance requirement of Rule 23(b)(3) until it could review the plaintiffs' final expert reports at the close of discovery.  See Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd., 247 F.R.D. 253, 273-74 (D. Mass. 2008) (the "Prior Order"). Discovery is now closed, and the final merit reports of the dueling liability and damages experts have since been filed. Tyco argues that the class should not be certified because, even after extensive discovery, Plaintiffs still have no viable method for establishing an antitrust violation and resulting injury on a classwide basis.

After hearings and a review of the briefs and the extensive record, the Court finds that Plaintiffs have met the requirements of Fed. R. Civ. P. 23(b)(3).  Accordingly, Plaintiffs' motion to certify (Docket No. 52) is **ALLOWED**.

## I.  BACKGROUND

The Court incorporates by reference its Prior Order.  Only the facts with all reasonable inferences drawn in Plaintiffs' favor are set forth below.

---

excludes Tyco, Tyco's parents, subsidiaries and affiliates. (Compl. ¶ 16).

A.    **THE CLAIM**

Since October 4, 2001, the start of the proposed class period, Tyco has had an approximately 50-65% share of the sharps container market in the United States.  Sharps containers are used for the disposal of "sharps," which are needle-inclusive bio-hazard medical products such as syringes, blood collection devices, and IVs.  Plaintiffs contend that Tyco, which produces disposable sharps containers, obtained its market share largely at the expense of its rivals, particularly rivals who provide reusable sharps containers.

According to Plaintiffs, Tyco leveraged its market power to foreclose competition by:

1.    imposing market share purchase requirements
      ("share requirements"), which, unlike volume-based
      requirements, require purchasers to purchase all or
      substantially all of their sharps containers
      <u>exclusively</u> from Tyco; and

2.    entering into exclusionary contracts with Group
      Purchasing Organizations ("GPOs") that negotiate
      standardized contracts with manufacturers and
      suppliers of medical devices on behalf of their
      members.

The above practices support two separate theories of market foreclosure.  The share requirements foreclosed the <u>sharps containers market</u> from rival competition.  The GPO exclusionary contracts, particularly sole-source contracts, foreclosed the <u>GPO brokerage services market</u> in sharps containers from rival competition.  Plaintiffs argue that Tyco engaged in its scheme

3

with the intent of substantially shutting its rivals out of both markets.

Plaintiffs allege that Tyco's practices punctured potential competitive pressure by rivals because the exclusionary practices effectively prevented them from selling to approximately 43% to 47% of the market and diminished their competitiveness because they cannot achieve economies of scale.  As a result, Plaintiffs allege that they were damaged by paying overcharges in purchasing Tyco's sharps containers -- the overcharges understood as the difference between the price of sharps containers resulting from Tyco's scheme and the price of the containers in the "but-for" world.

**B.   PROCEDURAL HISTORY**

This action has proceeded at a molasses pace.

Plaintiffs filed their complaint on October 5, 2005 and moved for class certification on December 15, 2006.  In support of their motion, Plaintiffs submitted preliminary expert reports from their liability expert, Einer Elhauge (Docket No. 120) and their damage expert, Dr. Hal Singer.  (Docket No. 121).  Defendants opposed, and filed a rebuttal expert report from their expert, Janusz Ordover.  (Docket No. 73).  Expert reply declarations were exchanged.  (See Docket No. 88 (Einer Reply); Docket No. 87 (Singer Reply); Docket No. 92 (Ordover Reply)).

The Court held a hearing on the motion on April 13, 2007, where the focus was on potential class conflicts between distributor class members and end user members.  See Valley Drug Co. v. Geneva Pharmaceuticals, Inc., 350 F.3d 1181 (11th Cir. 2003) (vacating certification of an antitrust class action because of similar conflicts).  In line with Valley Drug's procedural course, the Court permitted additional downstream discovery concerning any "fundamental" conflicts between end users and distributors, particularly large distributors Cardinal, Owens & Minor, and McKesson.  (See Prior Order at 267-68).

After a second hearing, on January 29, 2008, the Court found that Plaintiffs satisfied the requirements of Rule 23(a).  With respect to the issue of potential conflicts within the class, the Court found that the two proposed class representatives were adequate and reserved the right to subclass should conflicts arise.  (See Prior Order at 268-69).

However, the Court deferred determining whether the Plaintiffs satisfied the predominance requirement of Rule 23(b)(3).  The Court, in particular, found "[t]he preliminary nature of Prof. Elhauge's analysis . . . troubling," since Elhauge only "outlined a general methodology:  maybe-I'll-try-this-or-maybe-I'll-try-that."  (Prior Order at 273).  The Court acknowledged that Elhauge "proposes viable classwide methods to prove foreclosure and injury that have been admitted in similar

cases," although Elhauge admittedly had only done a preliminary review.  (Id.).

Accordingly, the Court held the following:

> As such, the Court will defer a final
> decision on class certification until the
> Court reads the final expert reports.
> Plaintiffs' expert report was due before
> Christmas, although it has not yet been
> submitted to the Court.  It makes more sense
> to determine whether Plaintiffs have
> satisfied the predominance requirement under
> Rule 23(b)(3), at this later stage of the
> litigation -- after the close of discovery
> and after a review of the final expert
> reports.  If Prof. Elhauge renders a final
> opinion which demonstrates predominance, and
> it is not fundamentally flawed, the Court
> will certify a class.  The Court emphasizes
> that, for purposes of this limited inquiry,
> the issue on class certification is not
> whether Plaintiffs will prevail on the
> merits, but whether common issues
> predominate.

(Prior Order at 273-74).  In so holding, the Court noted that, should it find predominance, it would also find superiority given the reluctance on the part of distributor class members to bring a separate action against a supplier.  (Id. at 274 n.6).

On April 11, 2008, Plaintiffs filed the final expert reports of Elhauge and Singer.  (See "Elhauge Expert Report," Docket No. 166, "Singer Expert Report," Docket No. 164).  Plaintiffs also filed a further Supplemental Memorandum to address issues of predominance.  (See Docket No. 157).  In response, Tyco filed a Supplemental Opposition (Docket No. 149), the final expert report of Ordover ("Ordover Expert Report," Docket No. 161), and the

expert reports of Thomas Hughes, an expert on GPO sole-source contracting, (Docket No. 159) and Margaret Guerin-Calvert, an expert on damages.  (Docket No. 160).  As with each round of briefing, Plaintiffs filed a Supplemental Reply.  (Docket No. 162).  No <u>Daubert</u> hearing has been held or requested.

## II.  <u>DISCUSSION</u>

Plaintiffs move for class certification under Fed. R. Civ. P. 23(b)(3).  The Court has already found that Plaintiffs satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a), and indicated that it would find that Plaintiffs satisfy the superiority requirement of Rule 23(b)(3).  (<u>See generally</u> Prior Order at 263-69, 274 n.6).  The sole remaining issue is whether Plaintiffs satisfy the predominance requirement of Rule 23(b)(3).

### A.  STANDARD OF REVIEW

#### 1.  <u>Predominance Under Rule 23(b)(3)</u>

Rule 23(b)(3) provides that an action may be maintained only if, along with satisfying the requirements of Rule 23(a) and superiority, "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  Plaintiffs bear the burden of demonstrating that the Rule's prerequisites have been satisfied.  See <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 613-15 (1997).

"Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." Amchem, 521 U.S. at 625 (citations omitted).  In antitrust cases, "common liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues."  6 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 18.25 (4th ed. 2002) (citing cases).

**2.  New Motor Vehicles**

On March 28, 2008, the First Circuit issued In re New Motor Vehicles Canadian Export Antitrust Litigation, 522 F.3d 6 (1st Cir. 2008) ("New Motor Vehicles"), which provided a different standard of review for "novel or complex" theories of injury in the antitrust class action context.  In New Motor Vehicles the First Circuit vacated certification pursuant to Rule 23(b)(3) for classes of indirect purchasers under various state antitrust and consumer protection laws.  In reviewing the plaintiffs' theory of antitrust injury, the First Circuit held the following:

> [W]hen a Rule 23 requirement relies on a novel or complex theory as to injury, as the predominance inquiry does in this case, the district court must engage in a searching inquiry on the viability of that theory and the existence of the facts necessary for the theory to succeed.

Id. at 26 (emphasis added).

As background, New Motor Vehicles involved an alleged conspiracy by the defendant car manufacturers to engage in

business practices, including some legal, vertical restraints but other, illegal, horizontal restraints, to "restrict the flow" of new, relatively less expensive cars manufactured for the Canadian market into the United States automobile market.  The plaintiffs alleged that the conspiracy "had the effect of suppressing the supply of Canadian cars in the United States," and thereby led to increases in the negotiating price range (the lower, dealer invoice price and the higher, MSRP price) for new U.S. cars.  <u>Id.</u> at 10.  The district court certified classes of indirect purchasers under various state laws who were injured by the inflated prices caused by the conspiracy.  Defendants appealed the certification of the damage class under Rule 23(f).

The First Circuit described the plaintiffs' theory of antitrust impact as follows:

> Plaintiffs' theory of impact on indirect purchasers is both novel and complex.  Injury in price-fixing cases is sometimes not difficult to establish.  Plaintiffs do not, however, advance such a price-fixing theory.  Rather, the plaintiffs' theory is that the higher prices are the result of a "but-for" world.  In <u>step one</u> of plaintiff's theory, but for the defendants' illegal stifling of competition, the manufacturers would have had to set dealer invoice prices and MSRPs lower to avoid losing sales to the lower-priced Canadian cars coming across the border for resale in the United States.  In <u>step two</u>, the higher dealer invoice prices and MSRPs enabled by this stifling of competition resulted in injury to consumers in the form of higher retail prices.

<u>Id.</u> at 27 (emphasis added).

As to step one of the theory, the First Circuit cautioned
that plaintiffs would have to (a) establish a "flood" of Canadian
cars in the but-for world that would have lowered prices as
compared to the actual world and (b) "sort out" in the actual
world the anticompetitive effects of the legal, vertical
restraints from the illegal, horizontal restraints at issue.  Id.
at 27.  Significantly, the Court noted: "While these are both
questions that are themselves susceptible to common proof (the
potential size of the gray market and the distinction between the
effects of horizontal and vertical restraints), they go to the
viability of a novel theory upon which plaintiffs rely to
establish an element of their claim through common means."  Id.
at 27 n.28.  It added that the "factual bases of theories of
common proof are appropriately, although preliminarily, tested at
the class certification stage."  Id. at 28 n.28.

As to step two, the First Circuit held that "it must include
some means of determining that each member of the class was in
fact injured, even if the amount of each individual injury could
be determined in a separate proceeding."  Id. at 28.  In
reviewing the proposal, the First Circuit questioned the
plaintiffs' "inference" that proof of an inflation of the
negotiating range would necessarily result in a "consumer-level
impact for each class member."  Id. at 28-29.  It commented that
"a minimal increase in national pricing would not necessarily

10

mean that <u>all</u> consumers would pay more," since "[t]oo many
factors play into an individual negotiation" of car prices by
different car purchasers, which included "hard bargainers" and
"poor negotiators" alike.   <u>Id.</u> at 29 (emphasis in original).
Even if one could determine an increase in MSRP and dealer
invoice prices, the Court questioned whether "it can be presumed
that all purchasers of those affected cars paid higher retail
prices."  <u>Id.</u>

     Although acknowledging that "the validity of plaintiffs'
theory is a common disputed issue," the Court insisted that "the
district court must still ensure that the plaintiffs'
presentation of their case will be through means amenable to the
class action mechanism."  <u>Id.</u>  The court summed up:

>          We are looking here not for hard factual
>          proof, but for a more thorough explanation of
>          <u>how</u> the pivotal evidence behind plaintiff's
>          theory can be established.  If there is no
>          realistic means of proof, many resources will
>          be wasted setting up a trial that plaintiffs
>          cannot win.

<u>Id.</u> (emphasis in original).

     **3.   <u>Applicability of *New Motor Vehicles*</u>**

     As a threshold matter, unlike in <u>New Motor Vehicles</u>, the
methodology for evaluating whether plaintiff has established a
prima facie exclusive dealing case is not "novel."  As one
leading treatise states,

>          [T]o succeed in its claim of unlawful
>          exclusive dealing, a plaintiff must show the

requisite agreement to deal exclusively (¶a)
and make a sufficient showing of power to
warrant the inference that the challenged
agreement threatens reduced output and higher
prices in a properly defined market (¶b).
Then it must also show foreclosure coverage
sufficient to warrant an inference of injury
to competition (¶c), depending on the
existence of other factors that given
significance to a given foreclosure
percentage, such as contract duration,
presence or absence of high entry barriers,
or the existence of alternative sources of
distribution or resale (¶d).

XI Herbert Hovenkamp, Antitrust Law ¶ 1821 at 167 (2d ed. 2005).

This approach is the one which Elhauge takes in his report. (See

Elhauge Expert Report ¶¶ 10-42); see also Prior Order at 270

(arguing that antitrust impact can be presumed from establishment

of five premises that substantially track the four above, only

adding redeeming efficiencies as a premise). Tyco's expert

Ordover grudgingly concedes that Elhauge takes this approach.

(See Ordover Expert Report ¶ 16 & n.12 (listing three "prongs"

that track the above, noting that "Professor Elhauge does not

necessarily follow this analytical structure but his work can be

assessed using these steps.")).

The theories that support the Plaintiffs' claim of antitrust

injury are also not "novel." One court reviewing nearly

identical exclusive dealing arrangements imposed by Tyco

concluded that the plaintiff, a competitor, had a viable

antitrust theory. See Masimo v. Tyco Health Care Group, L.P.,

No. 02-4770, 2006 WL 1236666, at *6-10 (C.D. Cal. Mar. 22, 2006)

(after a four-week trial, sustaining jury verdict in a suit by a competitor against Tyco that found, among other things, a Section 1 violation based upon "loyalty discounts" to hospitals, sole-source contracts with GPOs, and bundled discounts in the oximetry market).  The <u>Antitrust Law</u> treatise also cites numerous cases for the proposition that "antitrust policy should not differentiate between the manufacturer of widgets that explicitly imposes exclusive dealing on its dealers and <u>the manufacturer that gives such dealers a discount or rebate for dealing exclusively in the manufacturer's widgets</u>."  XI Hovenkamp, <u>Antitrust Law</u> ¶ 1807b at 128 & n.4 (emphasis added). Finally, the antitrust literature, including recent academic articles authored by and cited by both parties' experts, also supports the theory that the share requirements at issue in this case can cause anticompetitive injury.  <u>See, e.g.,</u> Einer Elhauge, Loyalty Discounts and Naked Exclusion (Discussion Paper No. 608, Feb. 2008); Janusz Ordover & Greg Shaffer, Exclusionary Discounts (CCP Working Paper 07-13, May 2007); <u>see also</u> Louis Kaplow & Carl Shapiro, Antitrust at 121-27 (Discussion Paper No. 575, January 2007) (forthcoming in <u>Handbook of Law and Economics</u> (A. Mitchell Polinsky & Steven Shavell eds.)); Michael D. Whinston, <u>Lectures on Antitrust Economics</u> 144-47 (2006).  As Ordover himself states, "[t]he issue here is not whether the challenged contracts, in the abstract, potentially could engender harm to competition and

consumers.  Rather, the issue is whether they, in fact, did have

such an effect."  (Ordover Expert Report ¶ 34).

Still, evaluating any exclusionary conduct under the rule of

reason is extraordinarily "complex."  As Supreme Court Justice

Breyer, an antitrust scholar, stated in another context:

> I recognize that scholars have sought to
> develop check lists and sets of questions
> that will help courts separate instances
> where anticompetitive harms are more likely
> from instances where only benefits are likely
> to be found.  But applying these criteria in
> court is often easier said than done.  The
> Court's invitation to consider the existence
> of "market power," for example, invites
> lengthy time-consuming argument among
> competing experts, as they seek to apply
> abstract, highly technical, criteria to often
> ill-defined markets.  And resale price
> maintenance cases, unlike a major merger or
> monopoly case, are likely to prove numerous
> and involve only private parties.  One cannot
> fairly expect judges and juries in such cases
> to apply complex economic criteria without
> making a considerable number of mistakes,
> which themselves may impose serious costs.

Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 127 S.Ct.

2705, 2730 (2007 (Breyer, J., dissenting) (citations omitted).

While it is unclear whether the New Motor Vehicles standard

applies to this case, its dictate is the salutary one:  an

admonition to the Court to take a hard look at the expert theory

before triggering the expensive class action mechanism.

Even based on a full record, though, short of a "per se" or

"quick look" case involving a horizontal conspiracy, see Cal.

Dental Ass'n v. F.T.C., 526 U.S. 756, 780-81 (1999) (citing

cases), a district court will face a difficult challenge in the class certification context in making a determination as to the ultimate viability of a plaintiff's exclusive dealing theory under a rule of reason.  Doing so based on a voluminous paper record with battling experts with outstanding credentials in their field even after the close of discovery will invite error. Despite requiring a "searching enquiry" as to viability, <u>New Motor Vehicles</u> does not require the court to require a full-blown <u>Daubert</u> hearing <u>prior</u> to class certification.

Rather, <u>New Motor Vehicles</u> is better read as requiring an expert not only to explain his theory of common antitrust injury, but also to provide a preview of the factual evidence to prove it.  In an antitrust class action, simply reciting the mantra that an expert theory will be provable by "common proof" without demonstrating <u>how</u> the pivotal evidence behind the theory can be established will no longer pass muster in this circuit.  <u>See</u> <u>New Motor Vehicles</u> at 29.  Of course, as will be demonstrated later, plaintiffs must also demonstrate that they meet the predominance criteria for class certification pursuant to Fed. R. Civ. P. 23(b)(3), itself an onerous task.

**B.    <u>STEP ONE</u> - The Viability of the Theory of Common Antitrust Violation**

Based on the final merits expert reports, the Court must determine whether the Plaintiffs' theory of common antitrust violation is "viable" -- that it is analytically and factually

supported in the record.  Professor Elhauge takes the position that common antitrust injury flows naturally from establishing five premises.  Prior Order at 270 (citing Elhauge Reply Decl. ¶¶ 3, 5).  They are: "(a) Market Definition," "(b) Market Power, "(c) Substantial Foreclosure," "(d) Diminished Rival Competitiveness," and "(e) Lack of Redeeming Efficiencies."  <u>Id.</u> (citations omitted).  The Court examines each in turn.

      1.   <u>**Market Definition**</u>

With respect to the first premise, both experts agree that the relevant market includes all disposable and reusable sharps containers and that the relevant geographical market is the United States.  (<u>See</u> Elhauge Expert Report ¶ 43; Ordover Expert Report ¶ 49 ("On this point, I agree with Professor Elhauge.")).  Elhauge contends that there is a separate GPO brokerage services market because, based on DOJ and FTC guidelines, a greater than 5% difference in prices exists for sharps containers sold through GPOs as compared to those not sold through GPOs.  (Elhauge Expert Report ¶ 65 & n.119).  Ordover disagrees that there is a separate GPO brokerage services market, but concedes that "the question of whether GPO brokerage services constitute a separate relevant market has no bearing on a proper economic assessment of [Tyco's] challenged actions."  (Ordover Expert Report ¶ 53).  Rather than thrash through the thicket of whether the GPO brokerage services market constitutes a separate market, the Court will take Tyco at

its word and assume the viability of establishing such a market.

**2.  Market Power**

Both Elhauge and Ordover rely upon data produced in discovery, as well as data provided by market research firms IMS and HPIS, to determine the market share of Tyco.  (Elhauge Expert Report ¶ 86; Ordover Expert Report ¶ 56).  Their calculations of market share only differ slightly.  (Ordover Expert Report ¶ 55; Elhauge Expert Reply ¶ 31)).

Elhauge contends that Tyco has market power because it had revenue market shares of 53.77-65.26% during the Class Period, there existed high entry barriers, and Tyco had the ability to control prices and exclude rivals.  (Elhauge Expert Report ¶¶ 14, 86 & tbl. 1).  With respect to the ability to exclude rivals and control prices, Elhauge cites compelling, direct evidence from Tyco's own documents and deposition testimony.  (Id. ¶¶ 108-17).  In one such deposition Tyco admitted that it sells at "a premium price. . . .  We're generally equal to or more expensive than our competitors."  (Id. ¶ 115 (quoting Herbert Dep. at 222)).

Ordover disagrees that Tyco has market power based on the following evidence.  In his opinion, Becton Dickerson ("BD"), a disposable manufacturer, provided a sufficient check on prices because BD was able to secure GPO contracts and did not believe it was foreclosed.  (Ordover Expert Report ¶¶ 28 & n.23, 57-58 & n.56).  Stericycle, another rival, grew "rapidly in recent years

17

to become a significant competitive threat," and has also secured GPO contracts. (<u>Id.</u> ¶¶ 59, 61). Because of this competition, Ordover believes Tyco's own market share, average prices, and gross market share have been in decline in recent years. (<u>Id.</u> ¶¶ 55, 63-64).

Elhauge's showing passes muster. The fact that there is a viable competitor does not defeat a showing of market power. <u>See</u> XI Hovenkamp, <u>Antitrust Law</u> ¶ 1821e at 170. In addition, Elhauge presents evidence, including internal Tyco documents that show that Stericycle and Daniels have not achieved sufficient economies of scale to compete effectively with Tyco. (Elhauge Expert Report ¶¶ 99-103). Finally, Elhauge points to antitrust theory to argue that some diminishment of market share, average prices, and gross market share over time does not necessarily show a lack of market power. Instead, Elhauge argues that such diminishments in this case show that Tyco was "most desperate to cling to that power." (Elhauge Expert Reply ¶ 34 & n.76). In sum, the Court finds that Elhauge has demonstrated hard proof of market power for the proposed Class Period.

### 3. <u>Substantial Foreclosure</u>

Elhauge contends that Tyco's share requirements and the GPO exclusionary contracts, separately and jointly, foreclosed the United States market for sharps containers on Tyco's competitors.

According to Elhauge, share requirements cause foreclosure because each individual purchaser has an interest in accepting and complying with Tyco's share requirements.  However, the share requirements in the aggregate foreclose a substantial portion of the end user market from rivals.  Thus, share requirements, even those voluntarily accepted and complied with, present a "collective action" problem.  (Elhauge Expert Report ¶ 26(c)). As put by Elhauge:

> The main reason buyers agree to exclusionary agreements that create anticompetitive marketwide effects is that the costs of their individual decisions to agree are largely externalized onto the rest of the market, while the benefits of avoiding price penalties by agreeing to the exclusionary condition go entirely to the individual buyer that agrees.

(Id.).  The "naked exclusion" model that Elhauge presents is well-established in the antitrust literature, which even Ordover admits.  (See Ordover Expert Report ¶¶ 20-21 & n.15).

Elhauge also contends that GPO exclusionary contracts independently foreclosed the sharps containers market by restricting the most efficient means of brokering contracts to sell sharps containers.  (Elhauge Expert Report ¶¶ 23, 35). Thus, Elhauge states, Tyco's exclusionary contracts with GPOs raised rival costs and increased barriers to entry in the sharps containers market.

To prove the foreclosure caused by Tyco's share requirements, Elhauge identified the standardized share requirement terms of GPO-brokered and non-GPO brokered contracts (See Elhauge Expert Report ¶¶ 144-158), and assessed whether buyers were restricted under those contracts.  To measure whether a buyer was restricted, Elhauge limited his analysis to GPO-brokered contracts due to gaps in the record of non-GPO-brokered contract terms.  (Id. ¶ 160).  Elhauge then determined whether a buyer was restricted by "having [his] staff manually match the names of buyers in the sales data" produced by Tyco and rivals BD and Daniels to the share requirements he earlier identified. (Id. ¶ 163).  He then had a computer calculate the total amount of foreclosure for each buyer and in the aggregate.

Elhauge determined that from the beginning of the proposed class period to the present, the share of Tyco sales foreclosed by contracts that restricted buyer purchases ranged from 50.19% to 73.29%.  (Elhauge Expert report ¶ 165 tbl. 6).  Elhauge acknowledged that, by focusing exclusively on GPO-brokered contracts, he "may well understate the actual foreclosure" caused by Tyco's share requirements.  (Id. ¶ 161).

To prove the foreclosure caused by Tyco's GPO exclusionary contracts, a much easier calculation, Elhauge examined all of the sole-source contracts that Tyco entered into with GPOs, and then determined the market share each sole-source GPO had in a given

20

year.  (Elhauge Expert Report ¶¶ 138-39, 142 & tbl. 3 & 4).

Elhauge also determined GPO market foreclosure conservatively,

considering dual source GPO contracts as unforeclosed.  (Id. ¶

139).  Elhauge concluded that "Tyco's sole-source contracts

foreclosed over 50% of the market from the beginning of the class

period through July 2005."  (Id. ¶ 140).

When considered cumulatively, depending on the year, Elhauge

found that Tyco foreclosed "42.97%-46.68% of sharps container

sales."  (Id. ¶¶ 25, 168 tbl. 8)).

Ordover disputes that any substantial foreclosure occurred.

With respect to the "naked exclusion" model that Elhauge employs,

he argues that Elhauge has failed to satisfy two preconditions of

the model: (1) small, "atomistic" buyers and (2) the lack of any

efficient rivals.  (Ordover Expert Report ¶ 23).  In his view,

GPOs are not small atomistic buyers, but effective negotiators.

Moreover, Ordover points out that the fact that Tyco's rivals can

compete freely for GPO contracts, even after they have been

awarded, means that they are not substantially foreclosed from

the market.  (See Ordover Expert Report ¶¶ 98-114).  In

particular, Ordover emphasizes that the GPO and share contracts

are terminable within 60 or 90 days notice.  (Id. ¶ 29); see also

Masimo, 2006 WL 1236666 at *5 ("In general, exclusive dealing

arrangements that are terminable on short notice are not

anticompetitive because foreclosure is very unlikely.").  For

example, with respect to Tyco's primary rival, BD, Ordover opines that it is "improper to deem [BD] as being foreclosed from competing for the business of a particular GPO's members if it fails to earn contract placement.  To begin with, [BD], over the purported class period, has had the unfettered ability to compete against [Tyco] for all GPO contracts."  (Ordover Expert Report ¶ 101).  As such, Ordover claims Elhauge has not demonstrated the applicability of the collective action problem.

In a highly theoretical dispute over the parameters of the collective action problem, Elhauge disputes the need to satisfy these two "preconditions," arguing that even Ordover admits that such preconditions are not always necessary.  (Elhauge Expert Reply ¶¶ 8-14; <u>see also</u> Ordover Expert Report ¶ 25 n.20 (acknowledging that preconditions are not necessary)).  Factually, Elhauge disputes the existence of ex ante competition among rivals for GPOs services, highlighting that "the evidence shows that numerous GPOs awarded Tyco sole-source contracts for sharps containers without any formal bidding at all, or with only limited ex ante competition, while excluding some suppliers."  (Elhauge Expert Reply ¶ 44).  He also points out side payments in the form of administrative fees paid to GPOs for sole-source contracts.  (<u>See</u> Elhauge Expert Reply ¶¶ 10, 65).  This fee structure, as well as the ability of a intermediary like a GPO to pass on the externality of higher prices to the purchasers,

undermines defendant's view of the robustness of the competition for GPO contracts.  With respect to the terminability of Tyco's exclusionary contracts, Elhauge replies that "[t]he same externality problem that gives GPOs perverse incentives to enter into harmful exclusionary agreements will give those GPOs incentives to stay in them even if they are terminable." (Elhauge Expert Report ¶ 141).

The applicability of the "naked exclusion" model is a merits dispute not amenable to resolution at the class certification stage.  Moreover, there is a fact dispute as to whether there exists ex ante competition for GPO contracts and whether in practice GPO sole source requirements give GPOs incentives to stay with Tyco rather than open up robust competition with Tyco's rivals.

Nevertheless, Elhauge has presented evidence that Tyco has successfully foreclosed a substantial part of the sharps containers market from rivals by getting individual purchasers to agree to purchase exclusively from Tyco.  It is enough that Elhauge has provided a thorough explanation of how the pivotal evidence behind his theory can be established with respect to substantial foreclosure.  Accordingly, Elhauge passes muster with respect to foreclosure.

### 4. <u>Diminished Rival Competitiveness</u>

Elhauge argues that Tyco's conduct diminished rival competitiveness by (1) preventing rivals from attaining economies of scale (or economies based on market share) that would have reduced the price of their sharps containers, (2) imposing barriers to entry for these rivals, especially entry into the market for GPO brokering services, and (3) even in the absence of share efficiencies, reducing rivals' ability to expand to constrain Tyco's behavior. (Elhauge Expert Report ¶¶ 32-37). Accordingly, Tyco's rivals could not reduce the costs of its sharps containers to compete with Tyco. In some extreme cases, rivals were deterred from entering the market or left the market altogether. (<u>Id.</u> ¶ 34).

To prove his theory of injury to competition Elhauge did, among other things, simultaneous comparisons of the share of sales of Tyco's rivals with respect to:

1. restricted versus unrestricted buyers;
2. buyers that bought through sole-source GPOs and those that did not;
3. buyers who bought through both types of contracts versus those who did neither; and
4. buyers who bought through either type of contract versus those who did neither.

(Elhauge Expert Report ¶ 179). Due to limitations in the evidence, Elhauge only did simultaneous comparisons for Tyco, BD, and Daniels. (<u>Id.</u>). Elhauge also performed longitudinal comparisons of Tyco's rivals over time. (<u>Id.</u> ¶ 189).

With respect to his simultaneous comparisons, Elhauge found that with each comparison "Tyco's rivals performed far worse at buyers restricted by buyer contracts or that purchased through sole-source GPOs." (Elhauge Expert Report ¶ 179).  For example, both Daniels and BD did significantly better with unrestricted buyers than with restricted ones, winning between "22 to 207 times more market share in the unrestricted segment." (Id. ¶ 180 & Exh. 9).  Elhauge also found that Daniels and BD, in terms of market share, did 8 to 141 times better with buyers not using Tyco's sole-source contracts, (id. ¶ 181 & Exh. 10); 18 to 215 times better with buyers without Tyco exclusionary (GPO and share based) contracts as compared to buyers with both (id. ¶ 182 & Exh. 11); and 26 to 211 times better with buyers without Tyco exclusionary contracts as compared to buyers with at least one type of exclusionary contract.  (Id. ¶ 183 & Exh. 12).  As with his estimates of foreclosure, Elhauge notes that "[a]ll of these simultaneous comparisons underestimate the total loss of sales suffered by Tyco's rivals due to the exclusionary conduct, because they do not take into account the fact that marketwide foreclosure impaired the efficiency of rivals." (Id. ¶ 187 (emphasis in original)).

With respect to his longitudinal studies, Elhauge compared, in particular, (1) rivals' share of sales at Novation (a GPO) before and after Novation entered into a sole-source contract

with Tyco and (2) regressions to compare the relative performance of rivals to Tyco over time.  (Elhauge Expert Report ¶¶ 189-90). With respect to the regressions, Elhauge found depressions in rival market share that ranged from 40.63% (caused by sole-source GPO contracts as compared to non-sole-source GPO contracts) to 78.30% (caused by share requirements as compared to no share requirements).  (<u>Id.</u> ¶ 192 & tbl. 9).

Ordover identifies a number of technical deficiencies with Elhauge's simultaneous comparisons and longitudinal studies. (<u>Id.</u> ¶¶ 115-24).  In particular, Ordover contends that Elhauge's analysis fails to account for the operational shortcomings of rival Daniels.  (Ordover Expert Report ¶¶ 125-36).  These alleged flaws, which do not go to the viability of the methods used by Elhauge, simply their execution, are better addressed at a <u>Daubert</u> hearing or at trial.

More importantly, Elhauge's findings provide a sufficient showing of diminished rival competitiveness under First Circuit and general antitrust law.  As a matter of general antitrust law, injury to competition can be inferred where plaintiff demonstrates a prima facie case of exclusive dealing and a substantial foreclosure to the market.  XI Hovenkamp, <u>Antitrust Law</u> ¶ 1821 at 167.  "[W]here entry barriers are significant and foreclosure percentages higher -- in the range of 30 to 50 or 60 percent -- there the challenged exclusive dealing is

presumptively unlawful unless the defendant convinces the fact finder that the exclusive dealing is justified by a significant defense." Id. ¶ 1822c at 194; see also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield, 373 F.3d 57 (1st Cir. 2004) ("For exclusive dealing, foreclosure levels are unlikely to be a concern where they are less than 30 or 40 percent."). Accordingly, Elhauge's findings as to diminished rival competitiveness are sufficient.

  **5.  Lack of Redeeming Efficiencies**

  Elhauge argues that Tyco's exclusionary contracts have no identifiable redeeming efficiencies, and waste little space stating so, as lack of redeeming efficiencies are typically a defense.  (Elhauge Expert Report ¶¶ 207-13); see also XI Hovenkamp ¶ 1820 at 161-62.  Ordover argues that GPO exclusionary contracting and share requirements do, in fact, provide redeeming efficiencies that lowered prices in the actual world.  As to GPO sole-source contracts, Ordover opines that such contracts, and, in particular, ex ante competition for such contracts, "is an effective tool for intensifying price competition to the benefit of sharps container buyers."  (Ordover Expert Report ¶ 78).  In response, Elhauge contends that Ordover confuses the efficiencies gained from GPOs themselves with the exclusionary terms at issue in this case.  (Elhauge Expert Report ¶ 211).  He points out that small hospitals could still gain volume discounts by joining GPOs

in the but-for world.

As to share requirements, Ordover contends that they generate efficiencies by removing uncertainty as to sales volumes, and provide benefits to small purchasers, namely hospitals, who cannot meet volume-based discounts.  (Ordover Expert Report ¶¶ 93-95).  In response, Elhauge contends that any efficiency provided by share requirements can be provided by volume-based requirements.  (Elhauge Expert Report ¶ 208).

These disputes, which primarily concern economic theory and modeling in the "but-for" world, are better resolved at a <u>Daubert</u> hearing or at trial.

In sum, Elhauge has presented a sufficient showing to establish the viability of his antitrust liability theory both as a factual matter and under established antitrust methodology at this class certification stage.

**D.    <u>STEP TWO</u> - The Viability of the Theory of Common Antitrust Impact**

The core issue for purposes of class certification concerns whether Elhauge can prove the fact of injury with respect to all class members.  As <u>New Motor Vehicles</u> emphasizes, Plaintiffs have a "duty to prove each [class member] was harmed by the defendants' practice."  <u>New Motor Vehicles</u> at 28 (quoting <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154 (3d Cir. 2001)).

Here the requirements of demonstrating predominance under
Rule 23 are not the same as those making out a prima facie case
of an antitrust violation.  The predominance requirement of Rule
23 presents the additional hurdle of showing antitrust impact for
all class members.  One court reviewing substantially similar
exclusionary conduct by the same defendant (which one jury found
violated the Sherman Act in the <u>Masimo</u> case) has denied class
certification where the expert only established an increase in
the "average" price paid by the class, but could not demonstrate
that small hospitals did not benefit from the exclusionary
conduct.  <u>See</u> <u>Allied Orthopedic Appliances, Inc. v. Tyco</u>
<u>Healthcare Group L.P.</u>, 247 F.R.D. 156, 168-170 (C.D. Cal. 2007)
(reviewing Tyco's share requirements, GPO exclusionary contracts,
and other conduct in the oximetry market).

Elhauge contends that the substantial foreclosure caused by
Tyco's conduct, combined with the diminished rival
competitiveness and the lack of redeeming efficiencies, resulted
in overcharges suffered by each direct purchaser.  Under
Elhauge's theory, because of Tyco's significant market power and
the foreclosure caused by its practices, it had the power to
"choose an unrestricted price that [was] far above the but-for
price." (Elhauge Expert Report ¶ 27).  Accordingly, "[b]ecause
Tyco could artificially inflate the unrestricted price in order
to induce buyers to purchase a substantial share from Tyco,

restricted prices that are lower than unrestricted prices would remain higher than the most competitive prices in the but-for world." (Id. ¶ 20). Thus, Elhauge argues that the "entire negotiating range" for sharps containers was higher than the prices in the but-for world, harming both the tough and weak negotiator alike.

In response, Ordover (who was also the defendant's expert in Allied) forcefully argues that some class members, specifically small hospitals, actually do better under the challenged share commitment contracts as compared to the assumed but-for world, because Tyco's "share contracts allow any hospital, irrespective of its size, to obtain discounted pricing." (Ordover Expert Report ¶ 138). To come to this conclusion, Ordover examined the amounts that hospitals paid under Tyco's contracts based on purchase volumes. He states:

> Small hospitals that received preferred
> pricing in the actual world through share
> commitment contracts quite likely would be
> worse off in the posited but-for world where
> their small purchases volumes, in the absence
> of a commitment, reasonably would not induce
> [Tyco] to offer the same, or perhaps even
> any, discount. Importantly, this conclusion
> holds even if one assumes that average prices
> would be lower in the but-for world, because
> a small hospital's relatively weak bargaining
> power in the absence of share commitments
> implies it most likely would pay prices above
> the average.

(Ordover Expert Report ¶ 140). Accordingly, in his view, even if

30

average prices are lower in the but-far world, Elhauge cannot prove antitrust impact on a common basis because small purchasers likely benefitted from Tyco's exclusionary conduct.

In an argument similar to the challenge to liability, Tyco also criticizes damages expert Dr. Hal Singer because his economic analysis only models how much the <u>average</u> price of sharps containers from all supplies in the industry would have fallen, rather than showing that all class members would have paid lower prices in the but-for world.  (<u>See</u> Singer Expert Report ¶ 23 ("Total damages to the class can be calculated by multiplying (1) the aggregate quantity of sharps containers purchased by the class from Tyco by (2) the difference between the <u>average</u> actual market price and the <u>average</u> but-for market price for sharps containers.")) (emphasis added).

Elhauge disagrees with Ordover's claim that small hospitals likely received better prices as a result of the restrictive share contracts because, in his view, it would not be economically rational for Tyco to set the committed price below the but-for prices that would result from full competition from the reusable manufacturers.  Elhauge does not dispute, though, that small-volume purchasers might be charged relatively higher prices than bigger hospitals in the but-for world without the "loyalty discounts."

Instead, the key point of dispute is whether Elhauge's

31

theory that all prices would be lower in the but-for world is correct.  This is an inherently difficult assessment because both experts must predict whether or not pricing will decline for all purchasers in a hypothetical but-for world where there is robust competition.

To demonstrate common antitrust impact, Elhauge relies on evidence (1) that rivals cannot reach economies of scale and therefore cannot compete effectively in price; (2) the presumption of antitrust impact that applies from the foreclosure of 43-47% of the market; and (3) actual documents that Tyco used restrictive agreements with the specific intent to kill the competition by reusable manufacturers, and that report a "price premium" in the sharps container market ranging from 15-30 percent.  (Elhauge Expert Report ¶¶ 114-115, 123).

This latter, direct evidence of price premiums is particularly damning.  One internal document states that, due to Tyco's 84% market share, it could charge "15-25% price premiums in the marketplace."  (Id. ¶ 114 (citing TYN0137253)).  Another document asserted a price premium of "20-30%" over rival products.  (Id. (citing TYN0017014-29)).  Still other documents reported a premium as high as 64%.  (Id. n.227 (citing TYN0021033-34)).  These price premiums were possible because of Tyco's explicit efforts to "block[]," "Lock out," and "keep out" rivals.  (Id. at ¶¶ 132-34 & n.282 (citing documents)).  In one

telling document, Tyco discussed an exclusionary contract used to
retain an account where "Daniels is knocking loudly at their
door," stating that the reasons for the contract could not be
revealed for "legal" reasons.  (Id. ¶ 132 & n.289 (citing
TYN0229556-58)).

Tyco vigorously challenges plaintiffs' reliance of an
"inference" or "presumption" of a common competitive impact on
all sharps purchasers.  As a matter of general antitrust law,
injury to competition, and thus higher prices, can be inferred
where plaintiff demonstrates a prima facie case of exclusive
dealing and a substantial foreclosure to the market.  XI
Hovenkamp, Antitrust Law ¶ 1821 at 167.  Once plaintiff has made
out a prima facie case "by showing market structure, power, and
coverage of the exclusive dealing arrangement sufficient to
create an inference of reduced output and higher prices in the
affected market. . . , the burden of production and proof then
becomes defendant's, to show an efficiency explanation likely to
undermine any inference that the exclusive-dealing arrangement
results in lower output and higher market prices."  Id. ¶ 1820 at
161-62 (emphasis added).

In this case, a reasonable inference can be drawn that the
harm to competition likely harms all purchasers.  The documents
attesting to Tyco's high price premiums and its anti-competitive
mindset are compelling evidence that a more competitive market

33

would likely bring down the negotiating range for all purchasers. While Ordover's "small hospital" critique seems reasonable, and gives the Court pause, Elhauge had reasonable responses and evidence to back up his conclusions.  In light of these price premiums, and Tyco's audacious and explicit goal to drive out the competition, common sense does not explain why Tyco would rationally give small purchasers a better deal in the actual world where there is little competition to restrain prices, as compared to in the but-for world where there is sharp competition for their business.  At least at the class certification stage, Elhauge has made a persuasive case of a harm to competition caused by exclusive dealing arrangements which likely affected the price range for all direct purchasers.

In sum, after reading the dense, difficult expert reports and the extensive briefing based on a full record, the Court concludes after a searching enquiry that plaintiffs have posited a viable theory demonstrating class-wide impact based on standard antitrust methodology and direct evidence.  Accordingly, the Court finds that the Plaintiffs have satisfied the predominance requirement for purposes of class certification under Rule 23(b)(3).

## **ORDER**

For the reasons stated, Plaintiffs' motion to certify (Docket No. 52) is **ALLOWED**.

/s/ Patti B. Saris

_____
PATTI B. SARIS
United States District Judge