UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                      )
NATCHITOCHES PARISH HOSPITAL          )
SERVICE DISTRICT and J.M.             )
SMITH CORP. d/b/a Smith Drug          )
Co., on behalf of itself and          )
others situated,                      )
                                      )
          Plaintiffs,                 )
                                      )
     v.                               )   Civil Action No. 05-12024 PBS
                                      )
TYCO INTERNATIONAL, LTD.;             )
TYCO INTERNATIONAL (U.S.), INC.;      )
TYCO HEALTHCARE GROUP, L.P.; and      )
THE KENDALL HEALTHCARE PRODUCTS       )
COMPANY                               )
                                      )
          Defendant.                  )
                                      )
```

**MEMORANDUM AND ORDER**

September 21, 2009

Saris, U.S.D.J.

**INTRODUCTION**

Defendants have filed a motion to exclude the expert report and opinions of Professor Einer Elhauge (Docket No. 249). The Court held a two-day hearing on January 8 and January 9, 2009, at which Professor Elhauge testified for Plaintiffs, and Professors Janusz A. Ordover and Daniel McFadden testified for the Defendants. With the consent of the parties, the Court hired Professor Orley Ashenfelter as an independent court expert.

Specializing in the field of econometrics,[1] labor economics, and law and economics, Professor Ashenfelter is the director of the International Relations Section at Princeton University.  The parties agreed to his appointment to evaluate the econometric analysis.  Professor Ashenfelter attended the <u>Daubert</u> hearing and submitted a post-hearing Report.  The parties were allowed to submit comments on the Report.

After the hearing, and a review of the voluminous submissions, the expert report of Professor Orley Ashenfelter, and the parties' comments, I **DENY** the motion.[2]

### DISCUSSION

#### A. The Gatekeeping Function

The admission of expert evidence is governed by Federal Rule of Evidence 702, which codified the Supreme Court's holding in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and its progeny.  <u>See</u> <u>United States v. Diaz</u>, 300 F.3d 66, 73 (1st Cir. 2002); <u>see</u> <u>also</u> Fed. R. Evid. 702 advisory committee's note.  Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

---

[1] Econometrics is defined as the application of statistical methods to economic problems.

[2] The factual background and summary of Professor Elhauge's studies are set forth in the Memorandum and Order, dated August 29, 2008 (Docket No. 169).

> knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The trial court must determine whether the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand" and whether the expert is qualified. Daubert, 509 U.S. at 597; Diaz, 300 F.3d at 73 ("[A] proposed expert witness must be sufficiently qualified to assist the trier of fact, and . . . his or her expert testimony must be relevant to the task at hand and rest on a reliable basis . . . ."). An expert's methodology is the "central focus of a Daubert inquiry," but a court "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998).

Because "the admissibility of all expert testimony is governed by the principles of Rule 104(a)," the proponent of the testimony must establish that the expert's opinion is reliable by a preponderance of the evidence. Fed. R. Evid. 702 advisory committee's note (citing Bourjaily v. United States, 483 U.S. 171


(1987)).  "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." Moore v. Ashland Chem., Inc., 151 F.3d 269, 276 (5th Cir. 1998).

Vigilant exercise of this gatekeeper role is critical because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand knowledge, and because an expert's testimony may be given substantial weight by the jury due to the expert's background and approach.  See Daubert, 509 U.S. at 595; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999) (noting that experts enjoy "testimonial latitude unavailable to other witnesses"); United States v. Hines, 55 F. Supp. 2d 62, 64 (D. Mass. 1999) ("[A] certain patina attaches to an expert's testimony unlike any other witness; this is 'science,' a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve.").

The Court must, however, keep in mind the Supreme Court's admonition that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.  If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to

"decide among the conflicting views of different experts." Kumho Tire Co., 526 U.S. at 153. As the First Circuit has stated:

> As long as an expert's scientific testimony rests upon "good grounds, based on what is known," Daubert, 509 U.S. at 590, 113 S.Ct. 2786 (internal quotation marks omitted), it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies, see id. at 596, 113 S.Ct. 2786.

Ruiz-Troche, 161 F.3d at 85.

In Daubert, the Court identified four factors that it believed might assist trial courts in determining the admissibility of an expert's testimony: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline." United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002) (citing Daubert, 509 U.S. at 593-94). The Court, however, stated that "[m]any factors will bear on the inquiry," and emphasized that it did "not presume to set out a definitive checklist or test." Daubert, 509 U.S. at 593; see United States v. Vargas, 471 F.3d 255, 261 (1st Cir. 2006) ("The trial court enjoys broad latitude in executing its gate-keeping function; there is no particular procedure it is required to follow.");

Mooney, 315 F.3d at 62.

Six years after its landmark decision in Daubert, the Supreme Court again emphasized the "flexible" nature of the Rule 702 inquiry, stating that the usefulness of the four factors articulated in Daubert will vary "depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire Co., 526 U.S. at 150 (internal quotation marks omitted). Thus, courts applying Daubert have utilized many other factors, including "whether the expert has adequately accounted for obvious alternative explanations . . . [and] whether the expert has employed the same level of intellectual rigor in the courtroom as in the relevant field of expertise." Blanchard v. Eli Lilly & Co., 207 F. Supp. 2d 308, 316 (D. Vt. 2002) (listing factors found to be "relevant" to a Daubert inquiry by courts and commentators) (internal citations omitted).

The Court's "gatekeeping function extends to all expert testimony, including economic analyses, not merely to evidence involving scientific conclusions." Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 175 F.3d 18, 34 n.12 (1st Cir. 1999). An economist's opinion must be based on justified and reasonable assumptions. See In re Aluminum Phosphide Antitrust Litig., 893 F. Supp.2d 1497, 1507 (D. Kan. 1995) (rejecting economist's opinion on damages because it did not account for changes in other market conditions). An expert must utilize

well-established and reliable methodologies in the preparation of his opinion. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 566 n.25 (11th Cir. 1999) (noting the proper inquiry regarding the reliability of the methodologies implemented by economic and statistical experts is "whether the techniques utilized by the experts are reliable in light of the factors (other than testability) identified in Daubert and in light of other factors bearing on the reliability of the methodologies.") The test for the admissibility of economic testimony is a flexible one with the touchstone of reliability.

    **B.**  **The Challenge**

        **1.**  **Credentials**

As a threshold matter, defendants have challenged Professor Elhauge's credentials because he holds no academic degrees in economics. He currently teaches antitrust, contracts, and corporations at Harvard Law School but has never taught a class in economics or statistical modeling. While he has taken undergraduate courses on economics, he majored in science. He took only one graduate level course on the economic analysis of legal issues. Based on this background, defendants contend he is not qualified to perform regressions and other technical statistical analyses.

Professor Elhauge claims that his area of expertise is "antitrust economics," which he defines as the "application of

economic principles and methods to antitrust issues." (Elhauge Dep. at 8). He has numerous publications in peer-reviewed journals, such as one on the anti-competitive effects of loyalty discounts published in the <u>Journal of Competition Law & Economics</u>. He has testified before the Senate concerning his views on the exclusion of competition through Group Purchasing Organizations, and in various court proceedings. <u>See</u> <u>generally</u> Declaration of Professor Einer Elhauge, Docket No. 198 ¶¶ 92-120.

Defendants' argument is unpersuasive. While he is not qualified as an expert in economics generally speaking or econometrics, Professor Elhauge is qualified in the narrower field of antitrust economics. Professor Ashenfelter, who is an expert in econometrics, pinpointed no methodological flaws or technical errors in the econometric analysis that Professor Elhauge presented.[3] (Report at 1, 25). In the comments on the report, defendants do not refute this conclusion. As the validity of the econometric methodology is not an issue in the case, the lack of econometric/economic credentials affects the weight, not the admissibility, of Professor Elhauge's testimony.

   2. **Validity of Assumptions**

Defendants vigorously challenge Professor Elhauge's

---

[3] There were initial technical challenges to the regression results which Professor Elhauge has apparently corrected by making various adjustments. (Report at 18).

simultaneous comparison regression analysis, and his "longitudinal studies" on the ground that they are all based on certain assumptions, which Defendants argue are not reliably grounded in the facts in the record.  Defendants argue that selectivity bias pervades Professor Elhauge's "simultaneous comparisons," particularly with respect to his share-of-purchase discount analysis.  (Report at 19).  The defendants' argument is that buyers who prefer Covidien's products are more likely to buy a high percentage of their needs from Covidien in exchange for a discount than are buyers who prefer a rival's Sharps containers.

Plaintiffs retort that the assumption that groups of buyers in the "burdened" group impacted by Covidien's challenged contracts and the "unburdened" groups have the same sharps containers preferences is not unreasonable in that the Sharps containers are basically plastic buckets with a top.  Defendants have presented no plausible explanation (such as increased safety or design features) as to why a purchaser might prefer one plastic container to another except for price differences.  Defendants also make a passing argument that there is selection bias in the sole-source contract simultaneous comparisons.  Professor Elhauge points out that due to the large variety and volume of medical products brokered through GPOs, and the small percentage that sharps containers represent, it is unlikely that any buyer selected its GPO based on the provisions of the sharps

container contract.  This also seems like a reasonable assumption.

Acknowledging the possibility of some such selectivity bias, though, Elhauge conducted "longitudinal comparisons" of rivals' share of sales at Novation, a General Purchasing Organization, before and after it switched from a sole-source contract and of buyers that switched their status over time (the so-called "switcher" regressions).  Defendants challenge these longitudinal studies on the ground they are predicated on other unreliable assumptions, for example, that they do not control for changing prices at Novation over time.  Another criticism is that the growth rate of Covidien's rivals at Novation was not statistically different in the year before the contract change and the year after it.  However, these challenges are based on facts that are either not clear in the record or are hotly disputed.

Defendants' weakest argument is that the "switcher" linear share regressions are unreliable.  While these linear share regressions require roughly the same set of "assumptions as the Novation study," Professor Ashenfelter adds "there is substantially more data in these analyses." (Report at 18-19).  Professor Elhauge's analysis "measures the difference between Coviden's rivals' shares at the same buyers when they are burdened and when they are unburdened" because "each buyer's

purchasing behavior is only being compared to its purchasing behavior at other times." (Report at 24). As Professor Ashenfelter says, "Assuming that buyer characteristics did not change substantially over the analysis period and that other market factors, such as price differences, do not explain the measured difference in market shares, these analyses provide estimates of the impact of the challenged practices at the buyers that switched contract forms." (Id.). The analyses "compare share at the same set of buyers over time and they take into account static buyer preferences." These "fixed effects" linear regressions show estimates that "rivals have roughly 10 percent more share at unburdened buyers than at burdened buyers." (Report at 11). Because it reduces or eliminates the problem of selectivity bias, this longitudinal approach is the most reliable analysis.

Because Professor Elhauge demonstrated anti-competitive impact by using three different reliable methodologies, which provide a cross-check on each other, the Court **DENIES** the motion to exclude his opinion.

### 3. Damage Control

Professor Elhauge does not claim that his analyses measure the difference in prices paid by the class between the actual world and the "but-for" world in which the practices did not exist. Dr. Singer uses the output of Professor Elhauge's

econometric analyses to supply the market shares for his damage calculation which requires a measurement of Sharps containers market shares in the "but for" world.  (Report at 4).  While Defendants now challenge the use of the simultaneous comparison output as this measure in their comments on the Report, they have withdrawn the motion for order to exclude testimony of Dr. Hal Singer (Docket No. 179), choosing to rely on cross-examination as their weapon of choice.  They note, however, that the "fixed effects linear regressions" show "dramatically lower levels of impact" from the challenged contracts then the simultaneous comparisons and other analyses.  I do not resolve this issue here.

## **ORDER**

The motion to exclude Professor Elhauge's testimony (Docket No. 249) is **DENIED**.

**S/PATTI B. SARIS**
United States District Judge